562 F.Supp. 61 (1982)
The OHIO RIVER COMPANY, Plaintiff,
and
Federal Barge Lines, Inc., and Agri-Trans Corporation, Intervenor Plaintiffs,
v.
GREAT LAKES CARBON CORPORATION, Third-Party Plaintiff,
v.
EAGLE MARINE INDUSTRIES, INC., Third-Party Defendant.
No. 80-173A(3).
United States District Court, E.D. Missouri, E.D.
December 30, 1982.
*62 Gary T. Sacks, Mary Bonacorsi, St. Louis, Mo., for plaintiffs.
James W. Herron, Peter B. Hoffman, St. Louis, Mo., for defendant.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits of plaintiffs' complaint, following trial to the Court. The plaintiffs seek damages for losses sustained when two barges broke away from their moorings at Great Lake Carbon's (GLC) dock facility on the Mississippi River near St. Louis. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333. After consideration of the parties' stipulation of facts, the testimony and exhibits introduced at trial, the parties' briefs, and the applicable law, the Court enters the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

FINDINGS OF FACT
1. Plaintiff The Ohio River Company (Ohio River) is a corporation duly organized and existing pursuant to law and was the owner of barges OR-3821 and ORG-2566.
2. Intervenor plaintiff Federal Barge Lines (Federal) is a corporation duly organized and existing pursuant to law and was the owner of barge T-2103B.
3. Intervenor plaintiff Agri-Trans Corporation (Agri-Trans) is a corporation duly organized and existing pursuant to law and was the owner of barge AT-168.
4. Defendant GLC is a corporation duly organized and existing pursuant to law. Defendant GLC owned and operated an unloading dock and mooring facility at or near mile 172 of the Upper Mississippi River, slightly upriver from the mouth of the River des Peres.
5. Defendant Eagle Marine, Inc. (Eagle Marine) is a corporation duly organized and existing pursuant to law. Defendant Eagle Marine engaged in the commercial barge switching and fleeting business in the St. Louis Harbor, and as part of its business, contracted with GLC to pick up and deliver barges to the GLC unloading dock and mooring facility.
6. The GLC load fleet facility consists of three cells or permanent mooring fixtures immediately south of the GLC unloading dock. The distance between each cell is approximately one hundred ninety to two hundred feet. The first loaded barge fleeted at this facility is normally moored at the middle cell, extends down to the southernmost cell and is attached to the northernmost cell by means of a two-inch lock line secured to the upriver outboard end of the barge.
7. On April 1, 1979, barge OR-3821 arrived in the St. Louis, Missouri, harbor area in tow of the Ohio River line towboat M/V A.P. BOXLEY. The OR-3821 was removed from the tow of the M/V A.P. BOXLEY by the Eagle Marine Harbor Tug M/V MARY BURKE. OR-3821 was moored at the GLC loaded fleet facility by the Eagle Marine Harbor tug M/V MARY BURKE whose crew is employed by Eagle Marine.
8. Capt. Calvin Simpson, master of the Ohio River towboat M/V J.N. PHILLIPS, contacted Eagle Marine pursuant to routine practice for delivering barges to GLC to determine the procedure that would be used for delivering barge ORG-2566 on April 10, 1979. Capt. Simpson received specific directions *63 from Eagle Marine to place barge ORG-2566 "underneath" the Great Lakes fleet. That meant barge ORG-2566 was to be moored to the downstream end of barge OR-3821. Eagle Marine also stated to Capt. Simpson that no Eagle Marine assistance could be rendered at the time but that Eagle Marine would take care of barge ORG-2566 later. Eagle Marine, however, did not thereafter alter the position of barge ORG-2566.
9. The delivery of barge ORG-2566 to GLC took place between 9:00 a.m. and 9:20 a.m. on April 10, 1979. The crew of the M/V J.N. PHILLIPS moored barge ORG-2566 to the downstream end of barge OR-3821 using stationary wire rigging attached and fixed on the barges.
10. Moored downstream of barge OR-3821, barge ORG-2566 thus extended lengthwise partially across the mouth of the River des Peres. Despite Eagle Marine's statement to Capt. Simpson, barge ORG-2566 was left in this position. Only the farther upstream barge OR-3316 was secured to the cells or permanent mooring fixtures of GLC's mooring facility.
11. The Ohio River crew thoroughly inspected the mooring lines securing barge ORG-2566 as well as the lines securing the two upstream barges, OR-3316 and OR-3821. All the barges and all the mooring lines were found to be secure and damagefree.
12. At about 9:20 a.m. on April 10, 1979, the M/V J.N. PHILLIPS departed the GLC facility. No Ohio River personnel had anything further to do with the barges moored at the GLC facility.
13. Near midday on April 11, 1979, the M/V NANCY ALLEN, a harbor vessel operated by Eagle Marine, delivered four more Ohio River barges to the GLC fleet. These barges were made up with hard rigging, two long by two wide, and were moored outboard of barge OR-3316 with two spring wires from the bow and stern of the lead barge to the bow and stern of barge OR-3316.
Upon their arrival at the GLC facility the Eagle Marine crew had found the fleet swinging out in the river. To remedy this, the crew pushed the fleet back to shore and made the stern line taut, even though the crew knew the Mississippi River was predicted to rise that day. The Eagle Marine crew did not sufficiently secure barges OR-3316 or OR-3821 to cell number six of GLC's facility, even though the M/V NANCY ALLEN had the means at hand to do so. Moreover, the Eagle Marine crew did not move barge ORG-2566 away from the mouth of the River des Peres.
14. On April 11, 1979, high water conditions prevailed on the Mississippi River near St. Louis. The National Weather Service was forecasting heavy rains and thunderstorms for that day. Between 4:00 p.m. and 7:00 p.m. on April 11, the St. Louis area received 2.4 inches of rain.
15. GLC employed no watchmen at its mooring facility past 3:30 p.m. and had no harbor crew or vessels available which it could use to maintain the fleet at its harbor facility. GLC was aware of the weather conditions prevailing at its mooring facility on April 11, 1979. GLC did nothing to fortify the mooring lines of its fleet on April 11, 1979, nor did it make any attempt to move barge ORG-2566 away from the mouth of the River des Peres.
16. Sometime between 7:00 p.m. and 8:00 p.m. on April 11, 1979, barges ORG-2566 and OR-3821 broke away from their mooring at the GLC facility; however, the barges remained tied to each other. All lines that broke were those secured by Eagle Marine personnel. The possibility of tampering or vandalism is nearly nonexistent because the cells and barges were all situated off-shore and were not accessible from the shore.
17. Barge T-2103B, owned by plaintiff Federal, was in tow of the M/V J.S. McDERMOTT proceeding upbound on the Mississippi near the Jefferson Barracks Bridge.
18. Capt. Laurence Faulkner, master of the M/V J.S. McDERMOTT, took all reasonable steps to avoid a collision with *64 barges ORG-2566 and OR-3821 which were moving in tandem downstream towards his tow, but was unable to avoid a collision in which Federal's barge T-2103B was damaged, as were the two Ohio River barges.
19. After striking the Federal barge in tow of the M/V J.S. McDERMOTT, the runaway Ohio River barges struck Agri-Trans' barge AT-168, which was moored downstream of the Jefferson Barracks Bridge at the fleet of the Jefferson Barracks Marine Service; barge AT-168 sustained damage as a result of the collision.
20. As a result of these occurrences, Ohio River incurred actual losses of $10,506.40 for the damage to barges ORG-2566 and OR-3821, Federal suffered actual losses of $43,205.44 for damage to barge T-2103B, and Agri Trans suffered actual losses of $2,778.75 for damage to barge AT-168.
21. The amount of losses suffered by Ohio River was paid on July 13, 1979; the losses sustained by Federal and Agri-Trans were paid on August 15, 1979, and May 31, 1979, respectively.
22. There is no showing by Ohio River that it suffered lost profits while barges OR-3821 and ORG-2566 were under repair. In fact, the evidence demonstrates that Ohio River had available other vessels to take the place of its two damaged barges while they were undergoing repair.
23. Plaintiff Ohio River incurred attorneys' fees of $15,719 in prosecuting/defending this action. This amount is fair and reasonable given all the circumstances of this action.

CONCLUSIONS OF LAW
1. The Court has personal jurisdiction over the parties to this action; the Court's subject matter jurisdiction over this action is premised upon 28 U.S.C. § 1333. Venue is proper in the Eastern District of Missouri.
2. The law presumes that the owner of a drifting vessel involved in a collision is negligent and responsible for the collision. Monsanto Co. v. Port of St. Louis Investments, 350 F.Supp. 502, 516 (E.D.Mo. 1972). Ohio River, however, as owner of the breakaway barges, has rebutted the presumption of negligence that arises from its status as owner of barges OR-3821 and ORG-2566. Ohio River moored barge OR-3821 underneath barge ORG-2566 at the direction of Eagle Marine personnel who assured the Ohio River captain that Eagle Marine would take care of the situation later. Ohio River personnel securely fastened and inspected all lines between OR-3821 and ORG-2566. Further, Ohio River was not responsible for any of the lines or wires that slipped or broke allowing barges ORG-2566 and OR-3821 to drift downstream.
3. Defendant GLC, as owner of the load fleet facility at which the Ohio River barges were docked, had the duty to exercise reasonable care with respect to the barges. In fact, because GLC was a bailee with respect to the barges, a presumption arises that its negligence resulted in the damage to the barges. In re Flowers, 526 F.2d 242, 244-45 (8th Cir.1975); O.F. Shearer & Sons v. Cincinnati Marine Service, Inc., 279 F.2d 68, 72 (6th Cir.1960). Not only has defendant GLC failed to rebut this presumption, but the evidence affirmatively indicates that GLC's negligence was partially responsible for the breakaway. GLC takes the position in this action that it was helpless inasmuch as it had no watchmen overseeing the situation at the load fleet facility and had no harbor crew or vessels available to maintain the fleet at its facility. GLC, however, can not be excused from liability simply by saying it did nothing. This is particularly true in light of GLC's knowledge of prevailing weather and river conditions on the day of the breakaway.
4. Moreover, GLC had agreed to indemnify Ohio River for losses to its barges or the property of others. Thus, GLC has an obligation under the contract with respect to the breakaway from which this action arose. No hold harmless clause or "act of God" clause in the contract absolves GLC from liability arising out of its negligence with respect to this matter.
*65 5. Defendant Eagle Marine was the last party to this action to conduct any activity at GLC's facility. Eagle Marine personnel secured the fleet after it was found swinging out towards the river and also added four barges to the fleet. Further, Eagle Marine was responsible for all the mooring lines or wires that failed. The breakaway occurred only a few hours after Eagle Marine's actions. In light of these facts, the Court concludes that a presumption of negligence arises on Eagle Marine's part. Pasco Marketing, Inc. v. Taylor Towing Service, Inc., 554 F.2d 808 (8th Cir. 1977); Federal Barge Lines, Inc. v. Star Towing Co., 263 F.Supp. 981 (E.D.La.1967). Far from rebutting the inference of Eagle Marine's negligence, the evidence establishes that Eagle Marine was in fact negligent. Eagle Marine failed to move barge ORG-2566 away from the mouth of the River des Peres, failed to add sufficient additional lines to the fleet given the weather conditions and the additional load of four barges added to the fleet, and made one line securing the fleet too tight in light of the rising waters predicted that day.
6. The Court concludes that the negligence of defendant GLC and defendant Eagle Marine was the cause of the breakaway and the resulting damage to the property of Ohio River, Agri-Trans and Federal. The Court further concludes that defendants GLC and Eagle Marine were equally responsible for the damage to the barges of Ohio River, Agri-Trans, and Federal, and hence actual damages to the plaintiffs will be allocated equally between GLC and Eagle Marine. United States v. Reliable Transfer Co., Inc., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).
7. The Court concludes that Ohio River's evidence on its claim for lost profits does not meet the high standard set forth in Cargill, Inc. v. Taylor Towing Service, Inc., 642 F.2d 239, 241 (8th Cir.1981). Specifically, Ohio River's claim is not supported by a "quantum and quality of evidence sufficient to establish the claim in a sum certain." Id. Hence, Ohio River's claim for lost profits will be denied.
8. Although attorneys' fees are not normally awarded to the prevailing party in an admiralty action, an exception exists when there is an indemnification contract that may be the source of such an award. Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 730 n. 5 (5th Cir. 1980). Clause 21 of the agreement between Ohio River and GLC is just such a source. The rule is clear that an indemnification clause can include attorneys' fees the indemnitee has expended to defend an action, even though the clause does not specifically provide for them. Bagby v. Merrill Lynch et al., 491 F.2d 192, 198 n. 9 (8th Cir.1974); see also E.C. Ernst, Inc. v. Manhattan Const. Co., 551 F.2d 1026, 1037 (5th Cir. 1977); City of Grandview v. Hudson, 377 F.2d 694, 697-98 (8th Cir.1967). This is so even though, as here, the indemnitee is a plaintiff in the case. Signal Oil & Gas Co. v. Barge W-701, 654 F.2d 1164, 1178 (5th Cir.1981).
In the present matter, the same evidence Ohio River used to rebut the inference of negligence arising from its ownership of the breakaway barges was necessary to prove the negligence of GLC and Eagle Marine. Thus, the Court does not see Ohio River's role as plaintiff in this action as a bar to its recovery of attorneys' fees under the contract. Ohio River was required, in effect, to "defend" itself against the claims of Agri-Trans and Federal, and in so doing, Ohio River made out a case of negligence on the part of defendants GLC and Eagle Marine. Thus, the Court finds defendant GLC liable under the contract to Ohio River for the full amount of Ohio River's reasonable and fair attorneys' fees  in this case $15,719.
9. Prejudgment interest is the rule rather than the exception in admiralty cases. Only peculiar or exceptional circumstances, none of which exists here, will bar an award of prejudgment interest. Federal Barge Lines, Inc. v. Republic Marine, Inc., 616 F.2d 372, 373 (8th Cir.1980). Such an award is intended to compensate the injured parties for the loss of use of their *66 money. Id. The Court concludes that the interest rate of ten percent per annum will accomplish this purpose in this case. The interest will be assessed on the amounts expended by plaintiffs Agri-Trans, Ohio River, and Federal for the repairs to their barges, as of the dates of payment found by the Court. Id. See Findings of Fact 20, 21.

JUDGMENT
In accordance with the Memorandum filed this day and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED, and DECREED that plaintiffs Ohio River, Agri-Trans, and Federal Barge Lines shall have judgment on their claims for property damages and interest against defendants Great Lakes Carbon and Eagle Marine in the following amounts: Ohio River, $10,506.40 plus 10% interest from July 13, 1979; Agri-Trans, $2,778.75 plus 10% interest from May 31, 1979; Federal Barge Lines, $43,205.44 plus 10% interest from August 15, 1979; costs shall be taxed against defendants Great Lakes and Eagle Marine.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that the property damages and interest awarded to plaintiffs in this action shall be allocated against defendant Great Lakes Carbon and defendant Eagle Marine equally; each defendant shall pay 50% of each plaintiff's award of damages and interest.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that plaintiff Ohio River shall have judgment against defendant Great Lakes Carbon on Ohio River's claim for attorneys' fees in the amount of $15,719.00.